[Opinion delivered March 3, 1886.]

---

## [No. 1981.]

## J. E. RAINEY *v.* THE STATE.

1. PRACTICE IN THIS COURT.— AFFIDAVITS *dehors* the record can obtain no standing in this court, and will not be considered for any purpose whatever, but will be summarily suppressed and expunged. A record, properly certified by the trial judge, speaks, so far as this court is concerned, all of the truth, and it cannot be attacked by affidavit nor in any other extraneous manner. Note the opinion for the comment of this court upon the argument of counsel in support of a question sought to be raised against the verity of the record by affidavit.

2. PRACTICE — JURY LAW.— Subdivision 14 of article 636 of the Code of Criminal Procedure disqualifies from jury service a person who, though able to read, is unable to write.

3. SAME — CASE STATED.— It was objected that the defendant was placed upon trial while the jury deliberating upon the case of his co-defendant had the custody of the indictment which charged the defendant and his co-defendant jointly, and that, in order to arraign the defendant, the trial court sent

for and had the indictment brought from the jury room, and read in this case. *Held*, that the objection is without merit.

4. Same — Evidence.— It is an elementary rule of practice that "when a witness is cross-examined on a matter collateral to the issue, his answer cannot be subsequently contradicted by the party putting the question." See the opinion for an application of the rule.

5. Same — Case Approved.— Note the approval of the preceding case of *Rainey* v. *The State* upon questions arising upon the documentary evidence in that case and this.

6. Murder — Fact Case.— See the statement of the case in this and *J. H. Rainey's* case, *ante*, p. 455, for evidence *held* sufficient to support a conviction for murder in the second degree.

Appeal from the District Court of Cooke. Tried below before the Hon. F. E. Piner.

Upon the same indictment which charged him jointly with his father (*ante*, page 455) with the murder of J. D. L. Johnson, in Cooke county, Texas, on the 14th day of February, 1885, the appellant was convicted of murder in the second degree, and was awarded a term of twenty years in the penitentiary.

The witnesses for the State, upon the trial of J. H. Rainey, with one exception, testified against this defendant, their statements in the two cases being substantially the same. In his testimony in the trial of the former case, the witness Floyd did not state, as he did upon this trial, that this defendant fired his second shot through the head of deceased, just as the deceased fell to the ground from the effects of the first shot. Mr. Ward, who testified upon the trial of J. H. Rainey, was not examined upon the trial of this defendant. Mrs. H. Ward and Sam McGee, in addition to the witnesses who testified for the State in J. H. Rainey's case, testified in this case.

Mrs. Ward testified that, in February, 1885, she lived on Stewart's place in Sadler's Bend, Cooke county, Texas, which place was near the public road leading to the Jimtown crossing of the Red river. On the evening that J. D. L. Johnson was killed, witness was at the wells, near the Jimtown public road, watering some cows. While witness was at the wells, two men passed her traveling north over the public road. Witness did not know the Raineys personally. One of those men rode a roan horse. The other was riding in a two-horse wagon which contained some millet straw. The man in the wagon was the older of the two men, and wore considerable beard over his face. He had a shot-gun. About thirty minutes after the wagon and the two men passed, three men on horseback, one of whom was John Stewart, passed the wells rapidly traveling in the same direction the wagon had gone. As the first two men

passed the wells, witness heard the older man in the wagon say to the younger man on horseback: "Let us hurry and get across Red river, and maybe they won't bother us." The younger man replied: "They will not take you while I live, and I will fight till I die." The witness could not identify the defendant as either of the two parties alluded to.

Sam. McGee testified, for the State, that he knew Serena Nelson, the plaintiff in the attachment which the deceased was attempting to execute at the time he was killed. During the month of November, 1884, the defendant came to the witness's house, and stopped at the fence. He did not get off his horse. During the conversation that ensued, the witness asked the defendant if "they" were going to the Nation. He replied that he did not know; that he did not know what might turn up; but that if they did go, they were not going to pay that note,— the note upon which the attachment was based. He then directed witness to tell Mrs. Nelson that the note was executed under duress, and that they were not going to pay it. He further told witness that if they did go to the Nation and J. D. L. Johnson ever made an attempt to attach any of their property, he would kill Johnson. Mrs. Nelson was the witness's step-grandmother, was seventy years old, and "she could not duress any one."

Cross-examined, the witness stated that he had no personal knowledge of the fact, if such was the fact, that his brother went to Rainey's house, and compelled old man Rainey, at the muzzle of two six-shooters, to kneel down and submit to a whipping with a quirt at the hands of his wife. If witness's brother made old man Rainey sign the note referred to, witness did not know it.

The narrative of Elmer Rainey, the first witness for the defense, was given somewhat more in detail upon this than upon the trial of his father. He testified on this trial that when the deceased and Lowery rode up to J. H. Rainey's house, in Cooke county, on the evening of February 14, 1885, the defendant and J. H. Rainey, witness and Bill McDonald were at the crib, loading J. H. Rainey's wagon with millet. Johnson and Lowery came to the house from the south. They rode up to the fence about forty yards from the crib, dismounted, hitched their horses, and jumped over the fence, when Johnson drew his pistol, and started towards the crib. J. H. Rainey then started to the house. Johnson and Lowery turned and started to the house. Defendant, witness and Bill McDonald then went through the yard and met Johnson and Lowery at the steps, some twelve or fifteen feet from the house. About that time J. H.

Rainey appeared with his gun in his hand. Johnson said to J. H. Rainey: "Old man, you look like you were on the war-path." J. H. Rainey replied: "No farther than to protect myself; besides, I want to know a man's business when he comes here. I have been whipped and beaten like a dog until I had to leave my home." Johnson said: "I have no papers for you and Jim, but I have papers for Elmer. Is this him?" referring to witness. J. H. Rainey replied: "Yes, that is him; serve your papers on him." Johnson then produced and read a warrant for the arrest of the witness for carrying a pistol. J. H. Rainey asked Johnson if he would be permitted to bail the witness. Johnson asked who he proposed to give as surety. J. H. Rainey replied that he would give Jim Wright. Johnson said that he would accept Wright. J. H. Rainey then asked Johnson if he had a blank bond with him. Johnson sat down to fill out the bond while J. H. Rainey, defendant and witness went to the crib to finish loading the wagon with millet. Witness threw the millet out of the crib and J. H. Rainey and defendant loaded it into the wagon. Meanwhile Johnson came to a point near the crib and sat down. When the wagon was loaded, witness and Johnson went to the house for witness to get his coat. At the house Johnson met Mrs. McDonald, and asked her what she was doing there. Mrs. McDonald replied that her husband had rented the place for the year, and that they were going to live there. Johnson said in reply to her: "You nor none of the Raineys shall live here, if I have to kill the last d—d one of you." Witness got his overcoat and went out and mounted his horse, and all of the parties started off towards Jim Wright's, J. H. Rainey going in front. Lowery and witness rode next, and defendant and Johnson brought up the rear. They traveled in that order until they reached the point where the roads forked. J. H. Rainey kept on the Jimtown road instead of taking the fork to Wright's house. Johnson told Lowery to take witness on to Wright's and let him give bond, and that he, Johnson, would be back presently, after riding a piece with defendant. Witness saw no more of them on that evening. The only papers served by Johnson on anybody on that evening were the papers he served on the witness. Johnson stated distinctly that he had no other papers.

Cross-examined, the witness stated that his brother, the defendant, did not stop at the forks of the road, but kept on down the Jimtown road. He did not tell Johnson or Lowery what to do with the witness. Witness was seventeen years old at that time, and lived with J. H. Rainey in the Chickasaw Nation. The defendant

lived at the J. H. Rainey "old place" in Cooke county.   Witness did not tell any of the party what Johnson said to Mrs. McDonald in the house.   While in the house the witness got his six-shooter and placed it in the waist of his pants.   Johnson did not see him get it, nor did the witness tell him.   After waiting at the forks of the road for some time, Lowery wrote on a piece of paper: "I am gone to Marysville," and went to Marysville.   Bill McDonald had a bay horse and a black horse.   He owned but the two.   Defendant rode a roan horse.

The defense next read in evidence the deposition of Mrs. M. J. McDaniel.   The transcript sets out the answers, but not the interrogatories.   The answers read as follows:

To the first interrogatory the witness answers: "My name is M. J. McDaniel.   I am thirty years old.   I live in the Chickasaw Nation, '*B. I. T.*'

2. "I was residing on J. H. Rainey's place, about two and a half miles northwest from Marysville.   I resided there about one and a half months.   I left on the 15th of February, 1885.

3. "I saw J. H. and J. E. Rainey at the house on the place where I was living.

4. "I saw J. D. L. Johnson on the Rainey place on the 14th day of February, 1885.   When I first saw him he was coming across from Captain Twitty's.   Mr. Lowery was with him.

5. "They were riding towards the house.   Mr. Johnson had a pistol.   If Mr. Lowery had one I did not see it.   Mr. Johnson was standing at the west yard gate with his pistol in his hand.

6. "They were riding when I first saw them.

7. "They dismounted and hitched their horses.   They came up through the lot towards the crib and stables, and then turned toward the west yard gate.

8. "J. H., J. E. and Elmer Rainey and James Rainey's wife and Bill McDonald.   They all met at the west yard gate.   Mr. Rainey came into the house, picked his gun up from the bed, and ran out to the gate where they were standing.   Mr. Johnson said: 'Mr. Rainey, we never speak, but I see you are on the war-path.'   Mr. Rainey said: 'I have been abused and beat like a dog, and run off from my home, and when any man comes to my place I would like to know his business.'   Mr. Johnson said: 'Mr. Rainey, I have no papers for you, nor none for Jim Rainey.   I have papers for Elmer Rainey.'   Mr. Rainey said: 'What is it for?'   Mr. Johnson said: 'For carrying a pistol.'   Mr. Johnson then asked: "Isn't that Elmer?'   Mr. Rainey said: 'Yes, and if you have papers for him,

serve them;' and he served them. Mr. Rainey then asked him if Elmer could give bond, and Mr. Johnson asked him who he would give on his bond. Mr. J. H. Rainey said: 'Mr. Jim Wright.' Mr. Johnson told him that Wright was good. Mr. J. H. Rainey then asked him if he had a blank bond, and told him to write one out. Mr. Johnson sat down on the steps and began to write one out, and all of the above named parties went out to the stable, and when Mr. Johnson got done he went out there too.

9. "The next I saw of Mr. Johnson was when he came to the house with Elmer, for Elmer to get his overcoat.

10. "Mr. Johnson asked me what I was doing there. I told him my husband had rented Mr. Rainey's place for the year. He said we had better leave; that he would kill every G—d d—d Rainey of the name, and every renter, before they should live on the place.

11. "I told my sister, my husband and J. E. Rainey what Mr. Johnson said. I told them right straight.

12. "The first time I saw J. H. Rainey with a gun that day was when he brought it with him from the B. I. T. He brought it in the house and laid it on my bed. He came with a wagon and team after hay.

13. "Mr. Johnson served no papers on any one except Elmer Rainey. He said that he had no papers for J. H. or J. E. Rainey.

14. "J. D. L. Johnson and Lowery left the farm with the three Raineys between 2 and 3 o'clock.

15. "I next saw them on Red river between 3 and 4 o'clock; J. H. Rainey, J. E. Rainey, John Stewart, Mr. Floyd and Bill McDaniel.

16. "My husband, Bill McDaniel, and two little children. I was afraid to stay at the Rainey place, as he, Johnson, had threatened our lives. When I first saw them, I was in about two hundred and fifty yards of them. I was in one hundred and fifty yards of them when the shooting commenced.

17. "We left just as soon as we could saddle our horses. My husband and two little children. We left because Johnson had threatened our lives. We went down on the west side of Mr. J. H. Rainey's farm in a path leading around the east side of the Crow farm and on to the Jimtown crossing.

18. "We went a near road.

19. "When I first saw them Mr. J. H. Rainey was driving pretty fast, and Mr. J. D. L. Johnson and his party were running after Mr. Rainey as hard as they could go. Mr. Jim Rainey was behind him some ten or fifteen feet.

20. "I was one hundred and fifty yards from them. Nobody was between me but Mr. Johnson and James Rainey, Floyd and Stewart. Mr. Johnson ran his horse around in front of Mr. Rainey's horses, dismounted and caught Mr. Rainey's horses by the bridle. Mr. Rainey jumped out on the right-hand side with his gun in his hand, and he and Mr. Johnson met about midway of the team, each advancing upon the other. Johnson had his gun in his hand. They took hold of each other's guns. At this time the other parties dismounted behind the wagon. Mr. Stewart had a gun, but Mr. Floyd had none that I could see. While Mr. Johnson and J. H. Rainey were scuffling, Floyd ran up and caught hold of Mr. Johnson, and then ran back to Stewart. I then saw a pistol in Floyd's hands. At this time Mr. Johnson's gun was fired, it looked like, in Mr. Rainey's face. This was the first shot fired. J. E. Rainey was then standing about ten feet behind Stewart and Floyd, and they were standing about ten feet south of the wagon. J. E. Rainey then, with his pistol in his hand, ran in between Stewart and Floyd. As he did this, Mr. Stewart raised his gun up to his shoulder as if he was going to shoot, and then let it down and raised it up the second time. As J. E. Rainey ran through, another gun was fired, but I don't know who fired it. J. E. Rainey then ran up to where Johnson and J. H. Rainey were standing, and fired two shots at Johnson. At the second shot Johnson fell. Jim wheeled around instantly and shot twice at John Stewart. At the second shot witness saw Floyd staggering around with his hands up to his face. When Jim Rainey fired at Stewart, Stewart dropped his gun and ran, and then Stewart and Floyd got on their horses and ran. J. E. Rainey got on his horse and J. H. Rainey into his wagon, and they started across Red river, J. E. Rainey a little in front. We,— myself, husband and children,— then went back home the way we came. I begged my husband to go back, for I was afraid to cross the river. My husband went down to rent us a house on Captain Twitty's farm and stayed all night.

21. "I am afraid to go [back to court?] for my life has been threatened by Bill Johnson, if I appeared as a witness any more. I am too poor to pay my expenses.

Her<br>
"M. J. ⋈ McDANIEL."<br>
Mark.

The answers to the cross-interrogatories read as follows:

1. "I first saw Mr. Johnson and Lowery coming across from Captain Twitty's about 3 or between 2 and 3 o'clock.

2. "J. H. Rainey, J. E. Rainey, Elmer Rainey and Bill McDaniel.

They were out at the crib and stables.   J. H. and J. E. Rainey were at the barn.

3. "J. E. Rainey stopped at the west gate.   J. H. Rainey came into the house and got his gun, and went back out there, where they were standing.

4. "J. H. Rainey came to the house just as soon as Johnson and Lowery came inside of the lot.   He, J. H. Rainey, came in a fast walk and came in my house.   He got his gun off the bed and then went to the west gate where they were standing.

5. "I answer this in the above.

6. "Not more than a half hour.   They went out at the west gate. J. E. Rainey, J. H. Rainey, Mr. Lowery and Elmer Rainey all left together.

7. "We left just as soon as we could saddle our horses.   I don't know how long it was.   I went to the river that evening.   My husband, Bill McDaniel, and two little children went with me.   I don't know how long, but just as soon as we could ride it.   I got back home the same evening.   My husband and two children.

8. "We saddled up our horses and went to the river.   I rode to the river.   We saddled two horses.   We went around the west side of Mr. J. H. Rainey's farm, and on the east side of Crow's farm. I carried one child, and my husband the other.

9. "I was in one hundred and fifty yards of where Johnson was killed.   He was shot with a pistol.   When I first saw Mr. J. H. Rainey and Mr. J. D. L. Johnson, J. E. Rainey, Mr. Stewart and Floyd, they and J. E. Rainey were going towards Mr. J. H. Rainey's wagon.   Mr. Johnson ran around in front of Mr. J. H. Rainey's horses, dismounted and took hold of J. H. Rainey's horses by the bridles.   J. H. Rainey jumped out of his wagon on the right hand side, and met Johnson midways of the wagon, and both took hold of each other's guns, and commenced scuffling with each other. Stewart and Floyd were some ten feet behind the wagon, and J. E. Rainey was standing ten feet behind them.   Floyd ran up and caught hold of Mr. Johnson and ran back to where Stewart was standing, and I saw that he had a pistol in his hand.   Then Mr. Johnson shot his gun off in Mr. J. H. Rainey's face, or at least it looked so.   Then J. E. Rainey, from behind, ran up, passing between Stewart and Floyd.   Stewart threw his gun up to his shoulder, and presented it at Jim; took it down, and presented it the second time. Jim ran straight and shot Johnson twice, and Johnson fell at the second shot.   During the time there was another shot fired at the wagon.   I do not know who did it.   When Jim shot Johnson, he

wheeled and shot at John Stewart twice, and in a few minutes John Stewart dropped his gun and run. Instantly I saw Floyd standing around with his hands to his face. Mr. Stewart and Floyd got on their horses and ran off towards Marysville. Jim Rainey got on his horse; his father got in the wagon, and they went across Red river, Jim Rainey in front.

10. "John Stewart, Floyd, J. E. Rainey, J. H. Rainey, Bill McDaniel and myself. Johnson and J. H. Rainey were next to the river; Floyd and Stewart south of them, and J. E. Rainey south of the whole party.

11. "I saw J. D. L. Johnson at the time he was killed. I was due south of where the killing took place, about one hundred and fifty yards. I was on horseback at the time. Bill McDaniel was with me.

12. "Just a few minutes. Me, my husband and two children went back home by the path leading around Crow's farm. All the way back it was about three miles.

13. "I got back home between sunset and dark. In going I traveled a pathway leading by Crow's farm. I passed by no house. I saw no person in going.

14. "My husband and myself did not remain at home all day on the day of the killing. No sir, I did not first learn it on the next morning. I saw it done. I know I was away from my house the day of the killing.

Her<br>
"M. J. ⋈ McDANIEL."<br>
Mark.

To this deposition was attached the following affidavits:

"THE STATE OF TEXAS,  }<br>
    *County of Cooke.*  }

"I, A. M. Thomason, on oath say that I am personally acquainted with Mrs. M. J. McDaniel, the witness whose name is subscribed to the foregoing instrument of writing; that I know her to be the identical person whose name is subscribed to said instrument, and I know her to be, and so believe her, a credible person and worthy of belief.          A. M. THOMASON."

"Subscribed and sworn to before me, this the 9th day of November, A. D. 1885.          S. W. BELLAH,

              "Notary Public for Cooke County, Texas."

"THE STATE OF TEXAS,  }<br>
    *County of Cooke.*  }

"We, Sam Bellah, and J. T. Whaley, notaries public for Cooke county, Texas, being the same officers before whom the above dep-

ositions and answers were taken of the witness Mrs. M. J. McDaniel, hereby certify that the person, A. M. Thomason, who has made the above affidavit as to the identity and credibility of Mrs. M. J. McDaniel is known to us, and is worthy of credit.

"Witness our hands and seals of office, this the 9th day of November, A. D. 1885.

[SEAL.]                                         "S. W. Bellah,
[SEAL.]                                         "J. T. Whaley,
                        "Notaries Public for Cooke County, Texas."

The witnesses Weir and Pattie, for the defense, and Ely and Gaston, for the State, in rebuttal, testified substantially as they testified on the trial of J. H. Rainey.

Vance and Burns testified, for the defense, that they were within five or six hundred yards of the point where the killing occurred at the time it happened. Six shots, all from a pistol, were fired. Soon after the shooting defendant and J. H. Rainey, traveling fast, crossed the river into the Nation. The witnesses, a few minutes later, saw the dead body of Johnson on the sand beach.

J. M. Wilson testified, for the defense, that he heard the witness Lowery testify on a former trial of this case. Lowery testified on that trial that the attachment read to J. H. Rainey by J. D. L. Johnson called on its face for a wagon and team, or a wagon and two horses, the property of J. H. Rainey. The defense closed.

Houston Lee testified, for the State, in rebuttal, that he witnessed the homicide from a point near where it occurred. Johnson fell, the witness thought, at the second shot. Witness was in the Jimtown road, two hundred yards south of the parties, when the difficulty began, but rode to a point fifty yards nearer. Witness did not then know any of the parties. The man who shot Johnson afterwards shot at Stewart and Floyd, and made witness stop.

Cross-examined, the witness stated that the man who proved to be Johnson took hold of Rainey's horses. As he did so, Rainey covered him with his gun and ordered him to release the horses. At the same time Rainey reined his team square around and crossed a small creek. When they got across the creek, Johnson again got in front and caught the team, and J. H. Rainey jumped out of the wagon on the right-hand side, and, with his gun leveled on Johnson, ran around the team. When Rainey jumped out of the wagon, Johnson was still holding the team, and witness heard somebody say: "Turn them loose or I will kill you." The man who did the shooting was the same man who made Stewart lay down his shotgun. Witness saw nothing of a man, woman and two children on horseback, just south of the place of killing at any time.

Mr. Hughes testified, for the State, in rebuttal, that when the shooting occurred he was standing in the Jimtown road about two hundred yards south from the place where it occurred. He saw nothing of Bill or M. J. McDaniel at the time of the shooting. To have reached a point one hundred and fifty yards south of the difficulty, the. McDaniels, traveling towards the river, would have had to pass the witness in the road.

Floyd and Stewart testified, in rebuttal, that they did not see Bill or M. J. McDaniel at the time of, or just before, or just after the shooting.

Lowery, recalled for the State in rebuttal, testified that neither Johnson nor Elmer Rainey went to the house of J. H. Rainey from the barn. Elmer Rainey's overcoat was not at the house, but was hanging on the yard fence.

The fifth bill of exceptions, referred to in the fourth head-note of this report, reads as follows: ". . . Be it remembered that upon the trial of the above cause the State introduced the witness William Johnson, brother of the deceased J. D. L. Johnson, in rebuttal, and asked him if he ever threatened the life of Mrs. William McDaniel, and he answered that he had not. The defendant, on cross-examination of the witness Johnson, asked him whether or not, at Marysville, about one month previous to this date, he did not state, in the presence of W. B. Johnson and A. M. Thomason and others, that it would be better for William McDaniel, the husband of the witness Mrs. McDaniel, to go to the penitentiary than testify in the Rainey cases again, for if he did so, he, Johnson, or William McDaniel, one, would have to die. Which question was objected to by the State as immaterial and irrelevant, because William McDaniel was not a witness in this cause; which objection was sustained by the court. The State's counsel then withdrew their objection, and permitted the witness to answer. The court stated at the time that if he did answer, that his answer would be final, and he would not allow the defendant to contradict him. The question was asked by the defendant, and the witness answered that he did not make such statement. The State's counsel then had said Johnson to repeat all that he said at that time and place. Defendant then offered to introduce W. B. Johnson, and show by him that said Johnson, brother of deceased, did state, at Marysville, about a month previous, that "William McDaniel had better go to the penitentiary than testify in the Rainey cases again; for, if he did, he, Johnson, or the said William McDaniel would have to die." The court would not permit the said William Johnson to answer. To all of which the defendant excepted," etc.

The motion for new trial raised the questions discussed in the opinion.

*A. M. Thomason* and *W. B. Johnson*, for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

White, Presiding Judge. This is a companion case to that of J. H. Rainey, just decided; both parties being jointly indicted for the same murder.

A preliminary question is raised by a motion of the assistant attorney-general to strike from the transcript certain affidavits which appear as addenda to the record after the same was completed and certified to by the clerk. These affidavits attack the correctness of the statement of facts made out and certified by the district judge, and it is claimed that much testimony adduced by defendant at the trial is entirely omitted. Even if these affidavits are conceded to state the truth, we know of no authority we would have to consider them. We must and will presume that the record speaks the truth, and that the statement of facts therein contained embodies all the testimony adduced on the trial; because it is so certified by the trial judge, and what he certifies is what the law permits us to consider, and nothing else. The motion of the assistant attorney-general will therefore be sustained, and these extraneous affidavits will be stricken out and expunged from the record.

But in this connection we make the following extract from the brief of counsel for appellant:

"The appellant, in every case, be it civil or criminal, is entitled to have a true statement of facts presented to this court, and a substitute for the same should be held for naught and the case reversed; for, while it is justly presumed that trial courts deal equitably and impartially with all those who are so unfortunate as to be compelled to resort to them, yet experience has taught us that there are exceptions to all rules, and the remark made by Judge Jeffreys, 'that there was no telling what some men would do if they only had the opportunity and the ability,' we find too often applicable to trial courts."

"*De fide et officio judicis non recipitur quæstio*" (the good faith and honesty of a judge cannot be questioned) is one of the most ancient maxims of the law. "The law," says Lord Bacon, "has so much respect for the certainty of judgments and the credit and authority of judges that it will not permit any error to be assigned which impeaches them in their trust and office, and in wilful abuse

of the same." Speaking from his own experience, Lord Jeffreys might well have given expression to the language quoted by counsel, for his career as judge is without a parallel and he is forever pilloried in history on account of his own judicial infamy. He has never, as we are aware, though noted for legal ability, been recognized as authority in legal or moral ethics, and a resort to such authority is itself the best answer to the possible charge made by appellant's counsel against trial courts. Such charges are entitled to no standing and weight whatever, when made under circumstances where the proprieties of the profession forbid that they should be made, and the officer charged is afforded no opportunity to meet and controvert them.

1. One of the disqualifications made by statute to a proposed juror is, that he cannot read *and write.* (Code Crim. Proc., art. 636, subdiv. 14; *Nolen* v. *The State,* 9 Texas Ct. App., 419; *Wright* v. *The State,* 12 Texas Ct. App., 163; *Garcia* v. *The State,* id., 335.) Under this rule the court did not err in sustaining the State's challenge to the *venireman* Ingram.

2. Whilst the jury were deliberating on the case of J. H. Rainey, the court had the joint indictment against defendant and said J. H. Rainey sent for in order that this defendant might be arraigned upon and plead to it. Defendant excepted. There is no merit in the exception.

3. In principle the third and fourth bills of exception embrace matters which have been fully disposed of by us in the case of J. H. Rainey.

4. The fifth bill of exceptions shows a cross-examination by defendant of the witness Wm. Johnson, brother of deceased, as to a collateral matter, to wit, if he, witness, had not threatened to kill one Wm. McDaniel, if he appeared and testified in the Rainey cases. The witness answered that he did not make such statement. It appears that Wm. McDaniel had not and did not testify on the trial of the cases. The defendant's counsel, however, proposed to impeach the witness Johnson's answer by proving that he did make such threats against McDaniel, and the court excluded the testimony, holding that, the matter being wholly collateral, the witness's answer was conclusive and it could not be inquired into further. It is a well settled, in fact an elementary rule, that " when a witness is cross-examined on a matter collateral to the issue, his answer cannot be subsequently contradicted by the party putting the question." (Whart. Crim. Evid. (8th ed.), 482; *Hart* v. *The State,* 15 Texas Ct. App., 202.)

5. Defendant's sixth, seventh and eighth bills of exceptions relative to the attachment writ, affidavit and bond for attachment, are discussed substantially and disposed of in the case of J. H. Rainey.

We find the charge of the court in this case a full and satisfactory exposition of the law, and the evidence is ample to sustain the judgment. We have found no reversible error, and the judgment is affirmed.

*Affirmed.*